UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ROBERT KYLE,
    PLAINTIFF

VS.

COMMISSIONER OF
SOCIAL SECURITY,
    DEFENDANT

CASE NO. 1:08CV191
(DLOTT, J.)
(HOGAN, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff filed his application for Disability Insurance Benefits in January, 2004. His application was denied, both initially and upon reconsideration. He then requested and obtained a hearing before an Administrative Law Judge (ALJ) in January, 2007 at Cincinnati, Ohio. Plaintiff, who was represented by counsel at the hearing, testified as did Medical Expert (ME), Dr. Wayne Wheeler, and Vocational Expert (VE), Dr. George Parsons. The ALJ reached an unfavorable decision in March, 2007, following which Plaintiff processed an appeal to the Appeals Council, which denied review in January, 2008. Plaintiff then timely filed his Complaint with this Court seeking judicial review.

## STATEMENTS OF ERROR

Plaintiff asserts three Statements of Error, referred to as "Assignments of Error" as follows: (1) the ALJ's finding that Plaintiff had transferable work skills is not supported by substantial evidence, (2) the ALJ erred in determining Plaintiff's RFC by failing to include all of Plaintiff's non-exertional work restrictions, and (3) the ALJ failed to consider the affect Plaintiff's inability to bend would have on his ability to perform sedentary work.

## PLAINTIFF"S TESTIMONY AT THE HEARING

Plaintiff testified that he lived at 211 Crown Ave., a private home, with his mother. Plaintiff stated that he was born in 1955 and is 6'2" tall and weighs about 400 lbs. Plaintiff stated he was right-handed, divorced and a licensed driver. He stated that he completed the 11th grade, but does not possess a GED. Past work experience was with Formica Corporation as a finishing process operator and supervisor for 18 years, a job which initially required him to be on his feet 95% of the time and to lift 20-50 lbs. The supervisor job required Plaintiff to write production reports, deal with safety issues, maintain equipment, etc. Shortly after a new management official was hired, Plaintiff was terminated in March, 2003.

When asked if he could do the job now, Plaintiff responded in the negative because of the need to sit down and catch his breath after minimal exertion. Plaintiff said that he attempted to find work for 10 months and then stopped in January, 2004 because it was then that he formulated the belief that he could not work at all. (Tr. 300-312).

Plaintiff described the supervisor job as a "working or hand-on supervisor." Although there was a "desk component" to the job, much of his time was on the floor. Plaintiff testified that he has no insurance and has attempted to obtain medical treatment for sleep apnea. He sees Dr. Dana Busing at University Pain Center on a quarterly basis. He testified that he has had one injection, but Dr. Enany didn't want to do another before an MRI was done. He took physical therapy for approximately one year and then decided to do home exercises with straps and a ball. Surgery in 2002 stopped his knee pain.

His current symptoms involved his back and knees. He takes Benazepril for blood pressure, Diclofenac, Tylenol, Oxycodone and Benadryl. Plaintiff testified that his right leg goes numb and starts to hurt if he sits too long. He estimated that he could walk 100 feet without needing to rest. He felt he could stand for 5 minutes, but couldn't walk for 5 minutes. He felt he could do a job involving paperwork at a desk if he could change positions every 15-20 minutes. He could walk up three steps if there was a railing. (Tr. 316-328, 352).

## THE MEDICAL EXPERT

Wayne Wheeler, M.D., testified as the ME. Dr. Wheeler is a board certified specialist in emergency medicine and a 1980 graduate of the University of Illinois Medical School. He practices in Portsmouth, Ohio. Dr. Wheeler said that Plaintiff suffers from "morbid obesity" and has weighed as much as 460 lbs. in February, 2005. Dr. Wheeler regarded Plaintiff's recent weight loss as a positive development, but cautioned that a "whole lot of weight" remains to be lost. There have been consistent reports of lower back pain, but no indications of radiculopathy. Plaintiff has had three episodes of perianal abscesses requiring surgical care. Plaintiff had knee surgery in 2002 and subsequent knee pain has been treated with pain medication. There was no indication in Plaintiff's medical record of cardiac disease or pulmonary disease, but there are complaints of shortness of breath.

Dr. Wheeler opined that Plaintiff did not meet Listing 1.04 because there was no evidence of nerve root compression as "numbness down the right leg doesn't meet the generally accepted definition of radicular type pain." Plaintiff has never had an MRI, so there was no proof of arachnoiditis or lumbar spinal stenosis. Dr. Wheeler said that Plaintiff can ambulate without aids, but that he does have limits in terms of distance. When asked if there was any objective evidence to support limitations in regard to Plaintiff's ability to lift, sit and stand/walk, Dr. Wheeler pointed to: (1) Dr. Busing's examination where Plaintiff reported mid-line lumbar pain whenever he stands or walks, (2) Dr. Busing's statement that Plaintiff's lateral flexion and bending is within normal limits, (3) Dr. Busing's report that Plaintiff experiences tenderness over L4-5 and L5-S1., (4) Dr. Busing's prescribing Oxycodone, (5) X-rays which show disc space narrowing at L1-2 and L2-3., (5) evidence of an old compression fracture at L2 and discogenic back pain and (6) arthritic knees.

Dr. Wheeler's opinion was that Plaintiff be restricted to sedentary work because of an inability to lift from the floor or overhead (although Plaintiff could lift 10 lbs. from the waist), the need to change positions at will and the inability to walk more than one block. Dr. Wheeler also suggested a restriction from climbing stairs, stooping and bending, crouching and from working at unprotected heights. Dr. Wheeler acknowledged that Plaintiff had arthritic knees and that his

3

weight exacerbated the knee pain. His knees exhibited crepitus and swelling and knee pain is not usually helped by elevation unless the whole leg is elevated. Dr. Wheeler agreed that Plaintiff has evidence of moderate degenerative disc disease and that it would be a source of low back pain.

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The VE described Plaintiff's initial work at Formica as a finishing process operator, medium work. He moved on to the job of general production supervisor, a light and skilled job. Dr. Parsons was asked four hypothetical questions, the first of which asked him to assume the restrictions of Exhibit 8F, the assessment by W. Jerry McCloud, M.D. Dr. Parsons responded that Plaintiff could perform both of his previous jobs. The second hypothetical asked the VE to assume all the restriction of Exhibit 8F and to add a restriction to light work, no climbing of ropes, scaffolds, stairs and only occasional balancing, stooping, kneeling, crouching or crawling. The VE responded that Plaintiff could perform his past relevant work as a general production supervisor, but not in the manner that Plaintiff was performing that job. The third hypothetical asked the VE to assume the accuracy of Dr. Wheeler's testimony. The VE responded that Plaintiff could perform the jobs of inspector, expediting clerk, shipping and receiving clerk and sedentary supervisor. The fourth hypothetical asked the VE to assume the accuracy of Dr. Busing's report. Dr. Parsons responded that Plaintiff could not perform the jobs.

A fifth hypothetical was formulated by Plaintiff's counsel and based on the report of Dr. Capurro. The VE responded that if those assumptions were true, Plaintiff would be unable to work. (Tr. 339-353).

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff suffered from obesity and low back and knee pain when considered in combination. The ALJ found that the above impairments were severe. The ALJ found that Plaintiff was unable to perform his past relevant work, but that he had transferable skills and could perform a limited range of sedentary work, specifically the jobs of inspector,

4

expediting clerk, shipping-receiving clerk and production supervisor, all of which existed in representative numbers in the national economy. Thus the ALJ concluded that Plaintiff was not disabled and unable to share in the Social Security fund.

## THE MEDICAL RECORD

Treatment notes from Alliance primary Care indicate that Plaintiff presented in June, 2002 for a complaint of vertigo. He was taking Boltrin, an anti-inflammatory for his knee. In October, 2002, Plaintiff reported low back pain and complained of persistent ankle and leg swelling. In November, 2002, Plaintiff also reported recurring vertigo. In December, 2002, the problem was a persistent cough and wheezing. In January, 2003, John Cupurro, M.D. reported that Plaintiff had no ankle swelling, no shortness of breath, no chest pain and no dyspnea on exertion. The diagnosis was hypertension, elevated BMI, intermittent vertigo and respiratory allergies.
In February, 2004, Plaintiff reported a "woozy feeling when bending over and looking up." Later that month, Plaintiff reported that he had gone to the Emergency Room at Mercy Anderson Hospital, diagnosed with asthmatic bronchitis and given Lithromax. His lungs were reported to be "hyperresonant, but clear." In June and October, 2003, Plaintiff saw Dr. Capurro for follow up on blood pressure medication. There were no headaches reported, but Plaintiff had dizziness in October, 2003. In November, Plaintiff reported vertigo. An x-ray of the heart in February, 2003 showed an enlarged heart. (Tr. 108-122)

Arthroscopic surgery was performed on Plaintiff's left knee by Steven Lawhorn, M.D. in January, 2001 at the Red Bank Surgery Center. The Operative Report showed that the postoperative diagnoses were (1) complex tear, posterior horn of the medial meniscus, (2) grade 3-4 medial compartment osteoarthritis, (3) grade 2-3 chondromalacia patella with trochlear involvement and (4) osteophytes patella and medial tibial plateau. Plaintiff was placed on crutches, told to elevate the leg and to use ice for swelling. Physical therapy was scheduled. (Tr. 124-141).

Plaintiff saw M. Lundberg, D.C. during the period from September, 2002 to October, 2002. Dr. Lundberg's report showed that Plaintiff exhibited a limited range of motion in his

lumbosacral spine and left knee, that his gait was affected, that he had limitations regarding standing, lifting, bending and walking and that he had degenerative disc disease. (Tr. 143-144). X-rays of the lumbosacral spine in September, 2003 showed "lumbar vertebral body heights are within normal limits, prominent anterior spondylosis at the thoracolumbar junction and degenerative facet joint disease in the lower lumbar spine." (Tr. 145).

Office notes from Kendall Gearhart, D.C., from January, 2004 through March, 2004 show that Plaintiff complained of low back pain, radiating to the right knee but that chiropractic adjustments did not help. Sitting does no affect the pain, but standing and walking does. Because of Plaintiff's size, he cannot fit into an MRI tunnel for determination of possible herniated disks. Lumbar range of motion was normal, but straight leg raising was negative. (Tr. 147-161).

Plaintiff saw John Capurro, M.D., an internist, for a variety of health issues during the period from March through October, 2004 , including blood pressure monitoring, hemorrhoids, bronchitis, vertigo and low back pain. Dr. Capurro reported lumbo-sacral radiculopathy and muscle spasms, but indicated that there was no muscle atrophy. He also reported that Plaintiff walked with a limp, had limited range of motion in his lumbo-sacral spine, but did not require an ambulatory aid. Included in Dr. Capurro's records was an Emergency Room report from Mercy Hospital, which states that what Plaintiff thought was hemorrhoids was a rectal abscess, which was drained under anesthesia by Stephen Perez, M.D. (Tr. 163-178).

Dr. Capurro referred Plaintiff to Stephen Heis, M.D., a specialist in physical medicine, for evaluation of Plaintiff's low back pain. Dr. Heis reported in April, 2004 that Plaintiff's low back pain occasionally radiated down the right leg, but not below the knee. Sitting caused immediate pain relief. Plaintiff was 6'3" tall and reportedly weighed 350 lbs. There was normal strength in his legs. Plaintiff was prescribed muscle relaxers and pain pills. Bone and MRI scans were planned. (Tr. 180-181). Neither the MRI nor the bone scan could be performed in May, 2004 as Plaintiff's weight was 470 lbs., contrary to his self-reported weight.

Plaintiff was examined by Christopher Wright, M.D. in May, 2004. Dr. Wright described Plaintiff as "morbidly obese." Dr. Wright's diagnosis was (1) morbid obesity, (2) chronic back pain, (3) left knee pain and (4) elevated blood pressure. Dr. Wright felt that Plaintiff's obesity contributed to his symptoms and "significant weight reduction would greatly diminish his

6

complaints." Dr. Wright opined that Plaintiff was "capable of performing a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects." (Tr. 183-186). An x-ray report of the left knee by Eli Rubenstein, M.D., in May, 2004 showed "moderate to advanced degenerative arthrosis of the knee joint." (Tr. 187).
Muscle testing in May, 2004 showed normal strength and range of motion in all extremities. There was no muscle spasm or atrophy. (Tr. 191).

A Physical Residual Functional Capacity Assessment was done in June, 2004 by Jerry McCloud, M.D. Dr. McCloud opined that Plaintiff could frequently lift 25 lbs. and occasionally lift 50 lbs. He could sit for 6 hours in a workday and stand/walk for 6 hours. He could occasionally balance, stoop, kneel, crouch, crawl and climb stairs, but should never climb ropes or scaffolds. In explanation of his opinion, Dr. McCloud stated that there was no evidence of end organ damage, that Plaintiff had a normal gait, that peripheral pulses were palpable, that the neurologic examination was normal and that range of motion of the dorsolumbar spine and knees was normal. Dr. McCloud also supported his opinion with the fact that x-rays of Plaintiff's left knee showed moderate to advanced degenerative arthrosis and that x-rays of Plaintiff's lumbar spine showed degenerative changes. Charles Darrow, M.D. agreed. (Tr. 192-197).

Dr. Heis reported in February, 2007 that Plaintiff continued to have back pain, but still could not fit into an MRI scanner. Diclofenac and Voltaren were prescribed for pain. (Tr. 199).

Records from University Hospital show that Plaintiff was seen in the Emergency Room in August, 2005 for intermittent low back pain. He was there not because of any medical emergency, but because he was unemployed and uninsured. Motor strength, sensation and reflexes were normal. An x-ray showed spondylolisis at L4 and some anterior spurring of the end of the lumbar vertebrae. The diagnosis was lumbago. Flexeril and Diclofenec were prescribed. Plaintiff was referred to the Orthopaedic Clinic, where he treated for approximately 4 months. (Tr. 201-215).

Plaintiff saw Vincent Pangalos, M.D., an orthopaedic surgeon, in August, 2005. Dr. Pangalos determined that Plaintiff had no radicular symptoms and his motor and sensory examination of the legs proved to be normal. Ultram was prescribed and a referral to Dr. Koppenhoefer was made. (Tr. 225-226).

7

Dr. Capurro completed a form entitled Medical Assessment of Ability To Do Work Related Activities in July, 2005. Dr. Capurro diagnosed Plaintiff with degenerative disc disease and degenerative joint disease. He said that Plaintiff's ability to lift/carry, sit and stand/walk were affected by his impairments. He restricted his occasional lifting to 5 lbs. and opined that Plaintiff could not walk/stand for more than 1 hour at a time and for no more than 2.5 hours in a workday. He could not sit for longer than 1 hour at a time and for no more than 2.5 hours in a workday. He should never climb, balance, stoop, crouch, kneel or crawl. He should be restricted from working at heights, with moving machines and from vibration. (Tr. 236-239).

In March, 2006, Plaintiff was given a steroidal injection of Marcaine and Depo-Medrol into the space at L4-L5 by Nasr Enany, M.D. (Tr. 247). Records from Spectrum Rehabilitation show that Plaintiff attended sessions from January to March, 2006 and left the program after completing 50% of the treatment goals. (Tr. 256-269).

Dr. Busing also completed a Lumbar Spine Residual Functional Capacity Questionnaire in January, 2007. Dr. Busing said that he saw Plaintiff a total of 8 times from October, 2005 through November, 2006. Plaintiff was diagnosed with lower back pain and bilateral knee osteoarthritis. Dr. Busing communicated that Plaintiff's prognosis was poor. Dr. Busing said films showed disc space narrowing at L1-2, L2-3 and L4-5, but that he was unable to obtain MRI information because of Plaintiff's weight. Dr. Busing opined that his patient could walk 1 block and sit for 45 minutes at a time. In a working day, Plaintiff could sit for at least 6 hours and stand/walk for less than 2 hours. Plaintiff would need to walk every 90 minutes for 2 minutes. He would need a job which permits him to change positions. He could occasionally lift 10 lbs, rarely lift 20 lbs., but should never lift 50 lbs. He should never stoop, crouch, climb ladders or stairs, but could rarely twist. Plaintiff's impairments would produce both "good days" and "bad days." Dr. Busing guessed that Plaintiff would miss about 2 days per month because of his impairments. He said that "Plaintiff does not complain of pain while sitting. Any job involving standing more than 5 minutes would be inappropriate." (Tr. 286-291)

8

**OPINION**

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal

9

those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The grid is designed for use when the alleged impairment manifests itself through limitations in meeting the strength requirements of jobs. 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). If plaintiff suffers solely from nonexertional impairments, the grid is inapplicable and the Commissioner must rely on other evidence to rebut plaintiff's prima facie case of disability. *Id.*, § 200.00(e)(1). Nonexertional impairments include "certain mental, sensory, [and] skin impairments" as well as "postural and manipulative limitations [and] environmental restrictions." 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). Where a plaintiff suffers from an impairment or a combination of impairments that results in both exertional and nonexertional limitations, the grid is consulted to see if a finding of disability is directed based upon the strength limitations alone. If not, the grid is then used as a framework and the Commissioner examines whether the nonexertional limitations further diminish plaintiff's work capability and preclude any types of jobs. *Id.*, § 200.00(e)(2). If an individual suffers from a nonexertional impairment that restricts performance of a full range of work at the appropriate residual functional capacity level, the Commissioner may use the grid as a framework for a decision, but must rely on other evidence to carry his burden. *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990); *Damron v. Secretary of H.H.S.*, 778 F.2d 279, 282 (6th Cir. 1985); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528-29 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). The existence of a minor nonexertional impairment is insufficient to preclude use of the grid for directing a decision. Rather, plaintiff must demonstrate that the nonexertional impairment "significantly limits" his ability to do a full range of work at the appropriate exertional level in order to preclude a grid based decision. *Atterberry v. Secretary of H.H.S.*, 871 F.2d 567, 572 (6th Cir. 1989); *Cole v. Secretary of H.H.S.*, 820 F.2d 768, 771-72 (6th Cir. 1987); *Kimbrough v. Secretary of H.H.S.*, 801

F.2d 794, 796 (6th Cir. 1986).

The Commissioner's finding that plaintiff obtained transferable skills from past employment must be supported by substantial evidence. *See Faison v. Secretary of H.H.S.*, 679 F.2d 598, 600 (6th Cir. 1982). The transferability of skills "depends largely on the similarity of occupationally significant work activities among [the] different jobs." 20 C.F.R. § 404.1568(d)(1); *see Blake v. Secretary of H.H.S.*, 528 F. Supp. 881, 885 (E. D. Mich. 1981). "Transferability is most probable and meaningful among jobs in which: (i) [t]he same or lesser degree of skill is required; (ii) [t]he same or similar tools and machines are used; and (iii) [t]he same or similar raw materials, products, processes, or services are involved." 20 C.F.R. § 404.1568(d)(2). "A complete similarity of all three factors is not necessary for transferability." 20 C.F.R. § 404.1568(d)(3). When skills are so specialized or have been acquired in an isolated vocational setting so that they are not readily usable in other work settings, the skills are not transferable. *Id.*

A skill is a "learned power of doing something competently; a developed or acquired aptitude or ability." *Blake v. Secretary of H.H.S.*, 528 F. Supp. 881, 885 (E.D. Mich. 1981) (quoting Webster's Third New International Dictionary (1964)). Transferable skills "refer to learned abilities which combine knowledge with coordinated physical movements, such as operating a typewriter, or a learned mental discipline, or an area of expertise." *Ellington v. Secretary of H.H.S.*, 738 F.2d 159, 161 (6th Cir. 1984). The Commissioner may not base a finding of transferability of skills on aptitudes common to most persons, such as the ability to see, think, use judgment, or use one's hands. *Id.; Weaver v. Secretary of H.H.S.*, 722 F.2d 310 (6th Cir. 1983). Thus, skills must be acquired and must relate to specific work activities. *Blake v. Secretary of H.H.S.*, 528 F. Supp. at 885; *see* C.F.R. § 404.1565(a).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson v. Secretary of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam) (emphasis in original); *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). Taking notice of job availability and requirements is disfavored. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 536-37

n.7, 540 n.9 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson*, 735 F.2d at 964; *Kirk*, 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980)(citing *Taylor v. Weinberger*, 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born v. Secretary of H.H.S.*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano*, No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the

12

ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.*, 508 F. Supp. 726, 730 (S.D. Ohio 1981).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in

substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

Plaintiff reached age 50 in March, 2005. Grid. 201.10 mandates a finding of disabled upon Plaintiff's reaching the age of 50 unless he had skills transferable to other work. The ALJ found that Plaintiff had transferable skills from his past relevant work as a working supervisor in the textile industry. Specifically, the ALJ found that "the Claimant's job as a supervisor involved the skills of interacting with others and supervising their work, knowledge of machines and machine operations, knowledge of tools and paper work skills, including performance appraisals of employees writing reports in general. The ALJ wrote that "[t]he vocational expert said these skills would also transfer to other jobs at the sedentary level without significant vocational adjustment."

The VE listed four jobs that he believed Plaintiff could perform because of the transferability of skills. These jobs were production supervisor, inspector, expediting clerk and shipping and receiving clerk. Plaintiff's prior employment as a supervisor for Formica involved sanding and cutting Formica. Plaintiff testified that he used machines, which we infer to be saws and sanders, and hand tools and that he was a trouble shooter with reference to machinery, instructed subordinates and wrote production reports. Plaintiff testified that he worked with a micrometer. Plaintiff argues that none of the jobs listed by the VE involve the use of similar tools and none were in the same industry. Plaintiff's argument is not completely correct. The VE listed the generic job of production supervisor and indicated that it could be done at the sedentary level and in the coatings industry, which would be similar to the laminate industry. The VE also testified that if a different industry were involved, Plaintiff may have to make a "significant vocational adjustment." The other three jobs do not involve the use of the same tools, nor are they in the same industry. However, the VE made it clear that in the heirarchy of transferable skills, the supervisory skills were the most significant.

The ALJ quotes the VE as saying that "[t]hese skills would also transfer to other jobs at the sedentary level without significant vocational adjustment." The ALJ's reference to

"these skills" included supervisory skills plus knowledge of machines and tools. The VE categorically did not say what he is quoted as saying. What he said was that, if a different industry was involved, the hypothetical person may have to make a significant adjustment. Despite the fact that the ALJ's statement was an overly broad interpretation of what the VE said, we do not find that the ALJ made an error prejudicial to Plaintiff. The point was that production supervisory jobs do exist in representative numbers and that supervisory skills are more significant in the big picture than specific knowledge of tools and experience in the industry.

The second error stated in Plaintiff's Statement of Errors is that the residual functional capacity assessment, and therefore the hypothetical question, was deficient because it failed to include all of Plaintiff's non-exertional work restrictions. Work absences and Plaintiff's ability to enter and exit the jobs listed by the VE were the argued deficiencies. Work absences were estimated in accordance with the established fact that Plaintiff experiences pain in his knees and low back and may find it necessary to miss work when the pain reaches an intolerable threshold. The VE testified, as Plaintiff indicates, that most companies would not tolerate more than 10 absences per year. However, Dr. Busing's statement that Plaintiff would miss approximately 2 days per month was a "guess." Dr. Gearhart, the chiropractor, said that sitting does not affect Plaintiff's pain and Dr. Busing also reported that Plaintiff did not report pain while sitting. Since sedentary work is largely performed while sitting, we find record proof to justify the ALJ's conclusion that Plaintiff would not miss work excessively because of low back or knee pain.

Plaintiff makes an additional argument that the ALJ erred by failing to include a no-climbing restriction in her residual functional capacity assessment in compliance with the reports of both Drs. Busing and Wheeler. The significance, Plaintiff argues, is that the VE was inconclusive on Plaintiff's capacity to enter and leave jobs where steps would be encountered. That a 470 lb., morbidly obese person should not be climbing ropes, scaffolds and ladders is so obvious that it need not be supported by medical opinion. However, his ability to climb steps and ramps is not so simple a proposition. Plaintiff testified that he was able to climb the three steps necessary to enter his home because there is a railing, but is

unable to climb three steps at a friend's home because there is no railing. Whether or not Plaintiff is able to climb more than three steps and at what frequency is not the subject of direct testimony, but Drs. Busing and Wheeler restricted Plaintiff from climbing "stairs," and Dr. Capurro, a treating physician, as was Dr. Busing, restricted Plaintiff from climbing. Dr. McCloud, the paper reviewer, indicated that Plaintiff could climb stairs occasionally. A common sense approach would be to say that whether one of Plaintiff's girth, with a painful back and knees can climb stairs depends on the length of the staircase, the height of the steps and the ascent speed, none of which we know. What we do know is that Plaintiff can climb at least three steps as long as there is a handrail and that being able to get to work and leave work are extrinsic factors not pertinent to the question before us.

The VE expressed the opinion that Plaintiff could perform all of the jobs identified without the need to climb stairs, so while it may have been the better practice to include a restriction from climbing stairs in the hypothetical question because that restriction was supported by substantial evidence, there was no error prejudicial to Plaintiff in this case because all the jobs identified were sedentary.

The last Statement of Errors concerned the affect Plaintiff's inability to bend would have on sedentary work. Plaintiff argues that Drs. Busing, Capurro and Wheeler all agreed that Plaintiff was unable to bend, thus Plaintiff argues that Social security Rule 96-9p was violated because the pool of sedentary jobs would be significantly eroded if Plaintiff were unable to bend. The ALJ ultimately accepted the residual functional capacity assessment of Dr. Wheeler, which assessment included a restriction against bending. Thus, the vocational testimony was based on an acceptance of all the restrictions imposed by Dr. Wheeler and all the jobs the VE located were based on that assumption. Although Plaintiff accurately presents the first part of Social Security Rule 96-9p, the second part permits the assumption included in the first to be subject to the testimony of a vocational expert. Knowing that Plaintiff cannot bend because Dr. wheeler said so, the VE located four sedentary jobs Plaintiff could perform without bending.

For the foregoing reasons, Plaintiff's assignments of error are without merit. The ALJ's decision is supported by substantial evidence and should be affirmed.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be AFFIRMED and this case be dismissed from the docket of the this Court.

February 18, 2009

Timothy S. Hogan
United States Magistrate Judge

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) in the event this Report is served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).